**The BORDEN COMPANY, Plaintiff,**

**v.**

**CLEARFIELD CHEESE CO., Inc., a Pennsylvania corporation, Defendant.**

**Civ. A. No. 64-548.**

United States District Court
W. D. Pennsylvania.

Aug. 13, 1965.

Pennie, Edmond, Morton, Taylor & Adams, New York City, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Eckert, Seamans & Cherin, Pittsburgh, Pa., for defendant.

DUMBAULD, District Judge.

The burden of defending against unmeritorious lawsuits is one of the inescapable concomitants of living in a civilized society, as Justice Brandeis has aptly reminded us.[1] Ancillary and incidental thereto, and an integral part thereof, is the burden of discovery procedure, under the rules adopted for the federal court system in 1937 through the efforts of Attorney General Homer Cummings.

There comes a time, however, where the hardship is so severe, and the injustice so manifest, that the courts will exercise their equitable powers in order to prevent abuse of process. The courts will refuse to be used as affirmative instrumentalities of injustice, but will leave the wrongdoers to their own devices. Whatever necessary evils may come must come through other agencies. Toyosaburo Korematsu v. United States, 323 U.S. 214, 247–248, 65 S.Ct. 193, 89 L.Ed. 194 (1944); Shelley v. Kraemer, 334 U.S. 1, 13, 20, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). As said in Bank of the

---

1. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 51–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Taxation is also part of the price of civilization, as Justice Holmes often remarked. Compania General de Tabacos v. Collector, 275 U.S. 87, 100, 48 S.Ct. 100, 72 L.Ed. 177 (1927). Military service is another burden which Leviathan does not shrink from imposing upon its constituents. Holmes, cited in Dumbauld, The Declaration of Independence and What It Means Today (1950) 61. Compared with the magnitude of these sacrifices, the exigencies of litigation are ordinarily scarcely more than trifling inconveniences.

United States v. Owens, 2 Pet. 527, 538, 7 L.Ed. 508 (1829), it "would seem to be plain and obvious that no court of justice can in its nature be made the handmaid of iniquity."

Patent litigation, of which the case at bar is an instance, furnishes a good example of the use of lawsuits as an economic weapon to harass competitors. The abuses of patent infringement suits, particularly in the glass industry, were exhaustively ventilated in the TNEC hearings, and led to antitrust prosecutions marked, among other features, by disciplinary proceedings against lawyers connected with prominent metropolitan firms for deceptions practiced on the courts handling those cases. United States v. Hartford-Empire Co., 46 F. Supp. 541, 612 (N.D.Ohio W.D.1942); Hartford-Empire Co. v. United States, 323 U.S. 386, 400, 65 S.Ct. 373, 89 L.Ed. 322 (1945); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 241–243, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Hartford-Empire Co. v. Shawkee Mfg. Co., 163 F.2d 474, 475–476 (C.A. 3, 1947); Hatch v. Ooms, 69 F.Supp. 788, 794–801 (D.C.1947). In the words of Justice Black: "Where the patent owner has ample resources to bear the costs of repeated litigation, the power of the infringement suit to stifle competition is increased. And where potential competitors are weak and few, it may afford a practically complete protection for the preservation of undeserved monopoly." Williams Mfg. Co. v. United Shoe Machinery Corp., 316 U.S. 364, 381, 62 S.Ct. 1179, 1188, 86 L.Ed. 1537 (1942). See also United States v. Hartford-Empire Co., 46 F.Supp. 541, 565 (N.D.Ohio W.D. 1942).

It must never be forgotten that the primary policy of the patent laws is to promote invention for the benefit of the public. Private gain is secondary. Pennock v. Dialogue, 2 Pet. 1, 19, 7 L.Ed. 327 (1829); Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510–511, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Mazer v. Stein, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954); Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330–331, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Dumbauld, The Constitution of the United States (1964) 153–154. A valid patent must add to, not detract from, the state of the prior art. As stated in Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950): "The function of a patent is to add to the sum of human knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans." Hence it is a public service to strike down an invalid patent, which is in truth a trespass upon the public domain, as Justice Douglas observed in Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 840, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The very power of Congress to grant a patent is limited and delineated by the purpose proclaimed in the constitutional grant itself. The power is one "To promote the Progress of Science and useful Arts"; the "exclusive Right" conferred by the patent is merely the means of accomplishing the intended result. Ibid., 836–837, 70 S.Ct. 899; Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154–156, 71 S.Ct. 127, 95 L.Ed. 162 (1950); U.S.Const. Art. I, sec. 8, cl. 8.

"It follows, from the language used in the Constitution, limiting patentability to inventions which in fact contribute to the 'progress' of science that every case involving the validity of a patent presents a constitutional question. Hence the Supreme Court of the United States is often required to devote its time and effort to determinations involving minute questions of fact with respect to the patentability of trivial gadgets."[2]

---

2. Dumbauld, The Constitution of the United States (1964) 154. Similarly, in civil rights cases and cases under the Federal

Employers Liability Act the majority of the Supreme Court often regards as a constitutional issue the procedural ques-

■■ It follows also, from these basic policies, that commercial success alone, without the requisite invention and novelty, will not establish patentability. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950). It further follows that the mere discovery of a phenomenon or law of nature is not patentable. Funk Bros. Seed Co. v. Kalo Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948).

Bearing in mind these controlling legal principles, we proceed to consideration of their application to the situation disclosed by the affidavits, depositions, and pleadings contained in the present record, in order to pass upon defendant's motion for summary judgment. This motion was filed on April 2, 1965, and argued on April 7, 1965. Briefs have been subsequently filed and considered.

Defendant, Clearfield Cheese Co., Inc. is a small local concern which in the 1950's developed a successful process for producing commercially acceptable individually wrapped slices of cheese. This process is unpatented (and, one may surmise, probably unpatentable) and is regarded by Clearfield as a trade secret, enshrouded in rigid security measures.

At that time Clearfield approached plaintiff, The Borden Company, a large national seller, regarding the possibility of Clearfield's · producing slices to be marked by Borden. Borden was not interested. (Moran dep. 5, 11–12).

Clearfield thereupon decided to produce individually wrapped slices on its own account and to put them on the market. It was successful, and in the fiscal year 1963–64 sold 29,211,000 pounds of such slices, having a dollar volume of $13,291,000. (Tate affidavit).

In 1963, the sale of such slices had become such an important factor in the market that Borden wished to enter it. (Moran dep. 16–17). As of November 1, 1964 Borden was selling slices of its own to certain selected outlets on an experimental basis (Ibid., 21). Borden expects to market nationally in the near future. (Erekson affidavit, par. 9).

In connection with the request of the marketing department for such slices to sell, the production department requested the law department to make a search for patents dealing with packaging of individually wrapped slices of cheese. As a result of this search the patent involved in this case, known as the Brandenberger patent, was unearthed. (Erekson dep. 14–15). As early as January 28, 1964, Borden was contemplating acquisition of this patent and an infringement suit against Clearfield. (Defts. Brief App. 14).

On February 14, 1964, Borden obtained an option on that patent for $7500 (Erekson dep. 25–26). Later (on April 30, 1964) the option was exercised and an additional $22,500 was paid. A general contract of assignment covering ten United States and Canadian patents was executed by plaintiff on May 1, 1964, and by La Cellophane on May 14, 1964. A special assignment of the Brandenberger patent involved here (No. 2,505,603) was executed by the assignor (La Cellophane) on May 27, 1964, specifically granting the right to sue for past infringements. This assignment of May 27, 1964, was recorded in the United States Patent Office on June 3, 1964. At this time Borden had decided to sue Clearfield for infringement. Ibid., 55. This suit was filed on May 22, 1964. No attempt was made to see whether the Brandenberger process would work be-

tion whether there was sufficient evidence to go to the jury. Thompson v. City of Louisville, 362 U.S. 199, 204, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Garner v. State of Louisiana, 368 U.S. 157, 163, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). Justice Frankfurter protested that consideration of such cases diverted the energies of the Court from the important problems suit-

able for consideration by the nation's highest tribunal. Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 525, 540, 547, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). See also Dick v. New York Life Ins. Co., 359 U.S. 437, 456–459, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959); Ex parte Republic of Peru, 318 U.S. 578, 602–603, 63 S.Ct. 793, 87 L.Ed. 1014 (1943).

fore it was bought (Ibid., 28–29). Up to July 30, 1964, Borden had not used the patent in its own production. (Ibid., 31–33). Its own experimental process does not use the teachings of the patent. (Steinke dep. 25–26).

In July, 1963, Borden contacted Clearfield to see if Clearfield could furnish Borden with individually wrapped slices for marketing by Borden. (Erekson dep. 42–44). At a conference at Borden's New York office on October 25, 1963, Clearfield indicated that its production facilities were fully employed, and also feared legal consequences under the Robinson-Patman Act if it supplied Borden more cheaply than other customers. (Ibid., 45–49). A letter of December 4, 1963, reiterated these objections. Borden concluded that "Clearfield was not interested in supplying us with cheese slices." (Steinke dep. 8). Borden's copy of the letter was marked in pencil "1–27/64 Hold till patents are cleared up".

Clearfield's process is regarded by defendant as a trade secret. Strict precautions are practiced to avoid its disclosure (Tate affidavit). To establish non-infringement, defendant attaches to its motion the affidavit of Karl B. Lutz, a prominent Pittsburgh patent lawyer, who states that he has "personally visited and examined" the defendant's operation, and has studied the Brandenberger patent (No. 2,505,603); and that he is "confident that if it becomes necessary to try this case on the merits, it will be determined that defendant's 'secret process' does not infringe the Brandenberger patent on which plaintiff relies" (Par. 5). He also points out (par. 7) that product claims 18 and 19 were cancelled during proceedings in the Patent Office (thus creating a file wrapper estoppel); and that Gage patent No. 1,654,871 (for tamales) discloses every feature of the alleged infringement by defendant of the Brandenberger process (par. 8).

■ Coming to the legal contentions of the parties, we agree of course that Rule 56 applies to patent cases, as well as other cases, and permits entry of summary judgment where no genuine issue as to material facts exists and the moving party is entitled to judgment as a matter of law. Alco Kar Kurb, Inc. v. Ager, 181 F.Supp. 97, 104 (D.N.J.1960); aff'd 286 F.2d 931, 933 (C.A. 3, 1961).

Defendant contends that this is a case of file wrapper estoppel. The argument is that since claims 18 and 19 were cancelled during pendency of Patent Office proceedings, the claims granted can not be interpreted as including anything covered by the abandoned claims. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 218, 220–221, 61 S.Ct. 235, 85 L.Ed. 132 (1940).

However, it will be noted that these were *product* claims. The patent as finally granted related to a *process*. The reason for rejection of the product claims appears to be primarily that the product has no intrinsic or independent identity, but is described in terms of the process of its production. Also, they do not accurately define the product other than by saying that it is a "solid product of such nature" that it can be poured hot into a tube; also they do not limit it to a food product. A further reason for rejection is that there was no novelty in the method of packaging. "The selection of a specific article to be packed, such as an article which is capable of being poured onto the packing material is deemed to be without patentable significance since this would appear to be a matter of choice only and well within the judgment and practice of one skilled in the art. Note that the Vogt reference discloses it to be old to package such an article." (Examiner Finkelstein, May 5, 1949).

These claims were then rewritten as 22 to 25, on August 26, 1949, the applicant stressing that the wrapper serves not only as packaging material but as a mould to shape the product itself. Claims 22 to 25 were cancelled by an amendment by the applicant on November 16, 1949, to expedite processing of the application, after a conference with the Examiner. Claims 30–33 were added, which became the 4 claims of the patent as issued. Claims 30 and 31 were revisions of proc-

ess claims 28 and 29, added by amendment on August 26, 1949.

Since the product claims were revised and allowed as process claims, we are not convinced that the doctrine of file wrapper estoppel applies.

We regard as stronger the "clean hands" [3] estoppel which defendant urges on the basis of the past dealing between the parties. Clearfield, after offering Borden the benefit of its secret process, and after having been rebuffed, expended large sums of money and much effort in building up a market for its own product. Borden, for competitive reasons, then desired a similar product and in 1963 sought to obtain it from Clearfield. This effort being unfruitful, it determined to find another way to meet the market demands of its customers. After learning of the Brandenberger patent, Borden had in mind a suit against Clearfield for infringement even before it acquired the patent. This shows that competitive reasons were uppermost. Borden wished to exert coercion on Clearfield with the purpose either of compelling Clearfield to supply Borden a satisfactory product, or to eliminate Clearfield as a competitive factor in the market, or to obtain through discovery in the lawsuit useful information regarding the Clearfield process, which was demonstratedly successful commercially.

Since Borden had never even experimented with the Brandenberger process when it acquired it, it would seem clear that competitive pressures rather than desire to practice itself the teachings of the patent was the dominant motive for the acquisition.

Consequently, defendant argues, Borden either thought the Brandenberger patent invalid or not infringed when it appealed to Clearfield for wrapped slices of cheese, or was itself willing to participate in infringement of the patent owner's rights. In any event, it can not now with clean hands and in good faith press its claim against Clearfield for infringement. We believe this contention to be well-founded, and that Borden is estopped from maintaining its action for infringement.

Defendant also contends that there is no infringement. The evidence on this point is found in the Lutz affidavit. Mr. Lutz's statement is not as direct and forthright as it might be. He does not state as a fact that the process used by defendant is different from that described in the Brandenberger patent; he does not state that in his opinion as a patent lawyer defendant's operation does not infringe the patent; he merely states that he is "confident" that in the event of a court trial "it will be determined that defendant's 'secret process' does not infringe the Brandenberger patent on which plaintiff relies."

Prediction of what a court or jury may do is often far from being a sure thing. Yet it would seem that upon a fair interpretation of the language used by Mr. Lutz it is to be regarded as equivalent to saying that when he examined defendant's process, in the light of the patent claims, he found that there was no infringement.

To interpret his words differently would be to assume that he was hurling nosegays at the judicial system, and pessimistically anticipating that the courts would reach a conclusion contrary to his own view of the law. This type of intellectual rotten-egging is a sport generally reserved for critics for the Supreme Court's constitutional decisions.[4] It is

---

3. Clean hands is a good defense in a patent infringement suit, as Judge Maris points out in De-Raef Corp. v. Horner Sales Corp., 10 F.R.D. 28 (W.D.Pa. 1950). See also Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245–247, 54 S.Ct. 146, 78 L.Ed. 293 (1933); Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 684, 64 S.Ct. 268, 88 L.Ed. 376 (1944).

4. For that Court, as Professor Wechsler observes, "above all others has the faculty of rendering decisions that accord a quality of rapid obsolescence to the learning we law teachers [and practicing lawyers] claim to have." Herbert Wechsler, "The Courts and the Constitution," 65 Col.L.R. (No. 6, June, 1965) 1001.
 A beautiful performance by one of the most outstanding gamesmen in this field

not likely to occur in the course of the commercial conflicts of competing cheese-mongers.

One could readily believe that Colonel Frederick Bernays Wiener, for example, if required to make an affidavit, in advance of the decision in Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed. 2d 620 (1964), regarding the outcome of that case might well predict that the Court would not be convinced by his able argument that to restrict Delaware's historic freedom to mould her own governmental institutions as a State would be to revive in a particularly pernicious form the doctrines of "substantive due process" so vigorously castigated by Justice Black in his opinion in Ferguson v. Skrupa, 372 U.S. 726, 729–732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).[5]

But with regard to a decision on the scope of the Brandenberger patent, we do not attribute to Mr. Lutz any such thought of a discrepancy between law as known by lawyers and as unknown by judges, and we accept (under all the circumstances of the case, especially the past dealings between the parties) his testimony as proving non-infringement.

This is not one of the cases where it is easier to reach a determination of non-infringement than to deal with the issue of invalidity. Were it such, the Supreme Court's admonition that the greater public interests attaches to the latter determination would be timely. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 63 S.Ct. 1143, 89 L.Ed. 1644 (1945). Here there must necessarily be a lingering doubt as to infringement, since the process is admittedly secret, and the evidence comes from partisan, though respectable and credited, sources. But the patent itself, as its name indicates, is something open to all. The scope of the monopoly granted by a patent is limited by the claims which show where the new knowledge

is Philip B. Kurland, "Foreword: 'Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government'", 78 Harv.L.R. (No. 1, November, 1964) 143, 144–45. He discerns four principal features in the Court's current output: (1) The Negro revolution; (2) subordination, if not destruction, of the federal system; (3) enhancement of judicial dominion at the expense of other branches of government, national as well as state; (4) absence of workmanlike product. As a rubric he cites Juvenal (Sat. vi:223) "Hoc volo, sic jubeo, sit pro ratione voluntas", and Moliere (Le Misanthrope, Act I, scene 1):

> Et c'est une folie à nulle autre seconde,
> De vouloir se mêler de corriger le monde."

Other fine players are Herbert Wechsler, "Toward Neutral Principles of Constitutional Law," [Holmes lecture, 1959] reprinted in Principles, Politics, and Fundamental Law (1961) 21–22, 43–47; Alexander M. Bickel, The Least Dangerous Branch (1962) 51–55; Frederick Bernays Wiener, Uses and Abuses of Legal History: A Practitioner's View [Selden Society Lecture at Lincoln's Inn] (1962) 24–25; Alfred Hill, "The Inadequate State Ground", 65 Col.L.R. (No. 6, June, 1965), 943, 989–90, 993–94, 996–98; and Anthony Lewis, "A Tough Lawyer Goes to the Court", New York Times Magazine, (August 8, 1965), 11, 67.

5. Cited in Appellant's Brief in Roman, pp. 79–87. In this connection, it is interesting to note the resemblance between the language of Chief Justice Warren in Bolling v. Sharpe, 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) and that of his fellow-Californian Justice Stephen J. Field in "liberty of contract" cases of an earlier day, such as Butcher's Union, etc., Co. v. Crescent City Co., 111 U.S. 746, 757, 4 S.Ct. 652, 28 L.Ed. 585 (1884), and Powell v. Com. of Pennsylvania, 127 U.S. 678, 691–692, 8 S.Ct. 992, 32 L.Ed. 253 (1888). Field's views, expressed as dissent in the Slaughter-House Cases, 16 Wall. 36, 106, 109–111, 21 L. Ed. 394 (1873), received majority acceptance in Allgeyer v. State of Louisiana, 165 U.S. 578, 589–591, 17 S.Ct. 427, 41 L.Ed. 832 (1897). Reaching its apogee in Lochner v. State of New York, 198 U.S. 45, 53, 25 S.Ct. 539, 49 L.Ed. 937 (1905), the dogma of liberty to pursue common callings without regulation was generally believed to have been overthrown in Nebbia v. People of State of New York, 291 U.S. 502, 523, 527, 536, 54 S.Ct. 505, 78 L.Ed. 940 (1934), and West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937). See Pfeffer, This Honorable Court (1965) 322–32; Sutherland, Constitutionalism in America (1965) 528–29.

attributable to and disclosed by the inventor begins and ends. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

As previously stated, the Brandenberger patent (No. 2,505,603) contains four claims. *In haec verba* they read:

"1. A food casting and wrapping process, comprising advancing a continuous strip of flexible wrapping material endwise, while progressively folding it into trough shape to form a mould, pouring into said mould a thermoplastic food product selected from the group consisting of confectionery products and fatty substances in liquid easily flowable state, folding the sides of the trough-shaped strip in overlapping relationship over the deposited food product to form a continuous mould tube having the food product therein, cooling the food product in said tube to a plastic state, squeezing said tube at spaced points to displace and press aside the plastic material and bring the opposite sides of said tube into contact, and forming thereby a series of successive interlinked packages, and cooling said packages to harden the food product therein into a rigid state.

"2. In a food casting and wrapping process as described in claim 1 the additional step of severing said tube at the squeezed sections thereof, to form individual separate packages.

"3. A food casting and wrapping process, comprising advancing a continuous strip of flexible wrapping material endwise, while progressively folding it into trough shape to form a mould, pouring into said mould a thermoplastic food product selected from the group consisting of confectionery products and fatty substances in liquid easily flowable state, folding the sides of the trough-shaped strip in overlapping relationship over the deposited food product to form a continuous mould tube having the food product therein, cool-

ing the food product in said tube to a plastic state, squeezing said tube at spaced points to displace and press aside the plastic material and bring the opposite sides of said wrapper into contact, forming thereby a series of successive interlinked packages, causing the contacting surfaces of said tube to adhere together, and cooling said packages to harden the food product therein into a rigid state.

"4. A food casting and wrapping process, comprising advancing a continuous strip of flexible wrapping material endwise, while progressively folding it into trough shape to form a mould, pouring into said mould a thermoplastic food product selected from the group consisting of confectionery products and fatty substances in liquid easily flowable state, folding the sides of the trough-shaped strip in overlapping relationship over the deposited food product to form a continuous mould tube having the food product therein, cooling the food product in said tube to a plastic state, squeezing said tube at spaced points to displace and press aside the plastic material and bring the opposite sides of said tube into contact, forming thereby a series of successive interlinked packages, goffering the contacting surfaces of said tube to cause them to adhere together, and cooling said packages to harden the food product therein into a rigid state."

The important features of the process are disclosed in Claim No. 1. As previously indicated in comment on the proceedings during pendency in the Patent Office, the principal feature is that the wrapper serves also to mould the product which it covers. The product is thus necessarily a "thermoplastic food product", which when heated will flow as a liquid, then become workable, and finally harden to a solid state. Apparently the patented process was originally intended to mould chocolate bars, or other confectionery products, or butter. Cheese is a

suitable food product, however, to be moulded and wrapped in accordance with the patent.

Claim No. 1 describes: (1) a continuous strip of flexible wrapping material, advanced endwise, and progressively folded into trough shape to form a mould; (2) insertion of the food product in flowable state; (3) folding the sides of the wrapper so as to overlap and form a "continuous mould tube" (which is then flattened and cooled); (4) squeezing the cooled, plastic product in the tube at stated intervals to push back the product and bring the opposite sides of the wrapper into contact, so as to form a series of successive interlinked packages, which are further cooled until the product hardens into a rigid state.

Claim No. 2 adds the additional step of cutting or severing the tube at the points where both sides have been squeezed together. This forms individual separate packages.

Claim No. 3 adds the feature of causing the contacting surfaces of the tube to adhere together. This would require use of a type of wrapping material which seals under heat and/or pressure such as is used in defendant's Nawrocki patent No. 2,759,308, or the use of some other mode of adhesion, such as gluing or stapling.

Claim No. 4 adds the feature of causing the contacting surfaces of the tube to adhere by "goffering" or crimping.

There is no evidence in the record as to how defendant's slices are closed at the ends, whether by heat-sealing, goffering, or otherwise; or as to what type of wrapping material is used.[6]

Does this process display the necessary novelty or invention to become validly patentable? Did the prior art include all the features embraced within the Brandenberger claims?

The advancement of a continuous strip of flexible wrapping material, which after receiving a filling is then formed into a continuous tube is certainly no novelty. Cigarette-making machines embodying this principle have been in use for at least more than twenty-five years. The same would apply to severing or cutting the tube into appropriate lengths.

Moreover, as defendant urges, the expired Gage patent (No. 1,654,871) for putting up tamales, certainly covers the use of a continuous length of wrapping material, folded about the inserted food product, as well as the use of severing devices at appropriate intervals.

But it may be urged that the Gage patent did not deal with *thermoplastic* foods that can be moulded by the wrapping material while soft, and then hardened.

But that cheese will melt and harden again, and can be moulded while it is soft, seems to us nothing but a phenomenon of nature, which has been known to housewives for centuries, and which is not patentable. The hardening or softening effect of heat is a familiar fact of life. Custards, cookies, aspic and gelatine are well-known household delicacies. The way of the potter with the clay has been known since Biblical times (and has been less mysterious, be it noted, than the way of a man with a maid, according to Scriptural writers).[7] Pertinent, too, is the case of the unpatentable printing ink which dried when heated. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 335, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). There is surely no patentable novelty in moulding a plastic food item into the desired shape, and then cooling it until it hardens.

Plaintiff's production chief, Erekson, himself said "we have poured hot cheese into wrappers for years". (Erekson dep. 66). Any novelty in the Brandenberger

---

6. If the Safeway samples analyzed by plaintiff were Clearfield's, heat-sealing cellophane was used but (for ease of opening) not heat-sealed, "the end seal depending to some degree on the adhesive quality of the cheese." App. to Dft's. brief, p. 2. There is thus no violation of Claims 3 and 4 shown.

7. See, e.g., Isaiah 30:24, 45:9; Jeremiah 18:4, 6, 19:11; Proverbs 30:18–19.

process (or in defendant's secret process, for that matter) is simply in its practical feasibility or commercial success; and this is not patentable, as we noted at the outset in reviewing the authorities.

 In any event the Vogt patent (No. 1,810,740) for continuous production of bricks of ice cream or analogous material would surely seem to settle the question of novelty *vel non* with respect to thermoplastic foods.[8]

Does anything hinge on the shape of the trough or tube?

Apparently the Brandenberger patent seems to contemplate filling with melted cheese a shallow rectangular-shaped trough. (See Fig. 2). The wrapper folds over the top of the slice (Fig. 4).

But the description says the trough has a "U-profile or the like". This could encompass many different shapes. Suppose it were V-shaped instead, and folded on the side edge rather than on top?

Suppose the trough were sealed at intervals before filling, and the separate pouches or compartments were then filled with molten cheese?

Suppose the trough, after being filled became wholly cylindrical (like a wiener) and then was flattened out by rollers to the desired slab shape?

Would these variations make any difference in the scope of the patent, or with respect to patentability of the process?

In their discussions on January 27, 1964, regarding the utility of the Brandenberger patent as an economic weapon against Clearfield, Borden officials raised the question whether "filling an unsealed tube" as distinguished from "filling a trough shape mold" would be an infringement of the patent.[9]

If, as we have hereinabove determined, the essential (though unpatentable) feature of the Brandenberger process is the simultaneous moulding and wrapping of the product, the shape of the trough would not be important.

 We conclude, therefore, that the patent is invalid.

For the foregoing reasons, defendant's motion for summary judgment should be granted.

In the light of this conclusion, there is no occasion to rule on the other pending motions. This opinion shall be deemed to embody the Court's findings of fact and conclusions of law.

---

8. We may note that a patent applicant is charged legally with knowledge of the state of the prior art, even if in fact he believes his process to be novel. *Duer v. Corbin Cabinet Lock Co.,* 149 U.S. 216, 223, 13 S.Ct. 850, 37 L.Ed. 707 (1893).

9. "John Sigalos [patent lawyer] is to give us an opinion on this point. If filling an unsealed tube will avoid an infringement of Brandenberger then we could not expect to take action against Clearfield if we own the Brandenberger patent." App. to Deft.'s Brief p. 14. There is no evidence in the record as to what opinion Mr. Sigalos gave.