ACS HOSPITAL SYSTEMS,
INC., Plaintiff,

v.

MONTEFIORE HOSPITAL and Wells
National Services Corporation,
Defendants.

Civ. A. No. 81–0787.

United States District Court,
W.D. Pennsylvania.

May 25, 1983.

Eric Reif, Pittsburgh, Pa., Frank J. Bena-sutti, Philadelphia, Pa., for plaintiff.

Alan Garfinkel, Pittsburgh, Pa., Darryl Mexic, Sughrue, Mion, Zinn, MacPeak Seas, Washington, D.C., for defendants.

## OPINION

DUMBAULD, District Judge.

Plaintiff ACS Hospital Systems, Inc., (hereinafter ACS), a company organized by Charles Sonnenberg and assignee of U.S. patent No. 4,183,057 issued to Sonnenberg on January 8, 1980, sues for infringement. Defendants allege invalidity as well as denying infringement. Defendant Wells National Services Corporation (hereinafter Wells) is the supplier of a device leased to and used by defendant Montefiore hospital in connection with the rental of television sets to patients in that hospital.

When television sets were first furnished to hospital patients, the lessor would have an attendant make the rounds daily (or more often), endeavor to rent sets to patients, and then wheel in a standard television set on a cart. In a later stage, the sets were permanently installed, but the switch was equipped with a lock (to which the attendant had the key) so that television could not be viewed by a patient until after he had made arrangements with the attendant and the set had been unlocked for use.

This proved inconvenient when a patient was admitted late in the afternoon, after the attendant had completed his rounds for the day. Under these circumstances the patient could not view television until the next day. Patients and the hospitals complained. One solution was called the "all-on" method, which consisted in simply leaving the set unlocked at all times, but this led to abuse and loss of revenue by the lessor (and by the hospital, which received its "cut" under its contract with the lessor).

While Sonnenberg worked for Wells, he sought to provide a totally computerized system, similar to the means by which the device in hotel rooms for seeing X-rated movies can be operated by the customer and automatically added to his hotel bill. The Wells management discouraged this approach, as it would mean that the lessor

"worked himself out of a job," since a completely automated system could be handled by the hospital itself, and the lessor, like Othello, would find his "occupation's gone."[1]

Sonnenberg left the Wells organization on October 1, 1975 and filed the application for the patent in suit on June 19, 1978. Sonnenberg claims that he invented the patented device, called Insta Rent, late in 1977 (PTX 65). It was manufactured early in 1978, and displayed at the Atlantic City hospital convention in May of that year (PTX 47). As of that date ACS holds a registered trademark for the use of that name (PTX 66). At the same time Wells and Montefiore officials became aware of the potential of the Sonnenberg device (PTX 11). The challenged Wells device supplied to Montefiore is properly called Instant On, though occasionally both names are loosely used by persons in the industry.

In paragraph 10 of the specifications issued by Montefiore on December 3, 1979 (PTX 25), it was provided that: "Vendor must insure that television is available for patient's immediate use at all time with responsibility of hostess to arrange payment schedule or discontinuation of T.V. service." The hospital's new contract with Wells dated March 4, 1980 (PTX 34) contained similar language.

■ Plaintiff contends that thereby Montefiore "induced" infringement, and incurred liability as an infringer under 35 U.S.C. § 271(b). This contention is without merit. The specifications are sufficiently general that they could be satisfied without necessarily using the Sonnenberg device.

In fact the "all-on" method would comply with the specifications.[2] So would any method not infringing the patent if it effectively permitted a patient to initiate television rental and viewing without the intervention of an attendant. Montefiore can be held, if at all, only for unauthorized use of an infringing device under 35 U.S.C. § 271(a), not for inducement under 35 U.S.C. § 271(b).

■ After these preliminaries, we turn to the language of Claim 1 of the patent,[3] reading as follows:

A television system constructed for rental use, the television system comprising:

actuating means including a key operated switch switchable between an off position for preventing normal operation of the television and an on position for enabling the television to be operated;

override switching means capable of being switched from a normal position to an actuated position for overriding said key operated switch when in its off position and enabling the television to be operated; its actuated position remains in said position until said key operated switch is switched into its on position; and

indicating means for providing an indicating signal when said override switching means has been switched into its actuated position.

It will thus be seen that the essential feature of the device claimed is that it

1. Shakespeare, Othello, Act III, sc. iii, l. 358.

2. Wells at first though it could improve the efficiency of its attendants so that the "all-on" method would suffice; but later feared it might lose the Montefiore account if it could not come up with a patient-operated device competitive with Sonnenberg's.

3. Plaintiff claims only infringement of this Claim. Defendant, as a measure of precaution, offered evidence of invalidity with respect to all six claims. Defendant's expert Dr. Fred Chernow, a very reliable and well qualified witness, whose credibility is accepted by the Court without reserve, testified that Claims 4 and 6 are defectively drawn and inoperable as stated. However this may be, we need not investigate these matters by study of the diagram in Fig. 2 of the patent, since plaintiff relies only on Claim 1. Moreover, as usual in patent verbiage, the additional claims are largely duplicative except for variants in details. We concern ourselves therefore in depth only with Claim 1. The celebrated pianist Arthur Rubinstein, at 90, stated on television: "We have no right to judge what we can not understand." Fortunately, the eminent musician never had to sit in a patent case.

permits the patient to use the television set, without the intervention of an attendant, when the switch is locked in the off position, by "overriding" the switch.

Overriding a switch simply means providing an alternative path for electric current so that the appliance may be operated even while the switch remains locked and inoperative.

A striking example of overriding a switch is provided when a juvenile delinquent car thief turns on the engine of the stolen car by using a piece of foil wrapper from chewing gum (or other suitable means) while the ignition switch of the car remains locked.[4]

Another familiar example is the convenient arrangement by which an electric light may be turned on from upstairs, or at one end of a hall, and turned off from downstairs, or the other end of the hall. A more sophisticated illustration is the system of electronic locks with plastic keys installed in some hotels, where the locked doors may be opened in case of fire or other emergency by an overriding mechanism.

Under Claim 1 of the Sonnenberg patent the patient by pushing two buttons can operate the television in normal fashion without the intervention of an attendant by overriding the key switch which remains locked until the attendant's next appearance, perhaps on the following day.

The procedure by which this is accomplished is shown by Figure 2 of the patent. The patient closes switches 10a and 10b whereby current passes through coil 11. The energized coil causes switch 9a to change position, thereby breaking the path from the tuner to the ground.[5] This permits normal operation of the television set. Normal operation is also permitted when the key switch 7 is turned to unlocked position by the attendant and breaks the path

of the current through 9a, 9c, 9d, to ground. When the attendant, when the light 5 is on, turns the key switch 7 to connect with coil 8, switches 9a, 9b, 9c, and 9d return to their original positions as in Fig. 2. Switch 9c thus breaks the path to light 5 and it goes out. The override system is then deactivated, but the set will operate normally because, as previously stated, key switch 7 breaks the path through 9a, 7, 9c, and 9d to ground.

No television sets embodying the Sonnenberg patent were offered in evidence, but it is clear that the system operates satisfactorily in practice and has been installed in hospitals, e.g. Moses Taylor Hospital, where Wells employees observed it (PTX 7). The "schema" or diagram in Figure 2 explains clearly the method of operation. (See also PTX 41, pp. 53–64 and trial testimony of Dr. Fred Chernow.)

In the case of the Wells system a large and small set were received as exhibits, and operated from time to time by counsel and witnesses. The small set is of the type used in the intensive care department of Montefiore.

The "schema" of the Wells system is found in Exhibits CY and CZ. The system was designed by Isaak Elbaum, a witness of credible demeanor, who says he prepared the prototype early in 1980 without having seen or examined the Sonnenberg system. A demonstration for the Wells management took place on February 29, 1980 (see Exhibit AU).

It is clear that the Wells system, although it also permits the patient to watch television without the intervention of an attendant, is quite different in design and structure from the Sonnenberg system. The crucial difference is that the Wells system

---

4. That the switch is mechanically locked in the off position is an immaterial incidental aspect of the technique of overriding a switch. The use of such mechanical locks on switches is a common practice in the prior art as shown by the example of automobile ignition switches and the switches in elevators for turning on the power. The example of the two unlocked switches controlling an electric light in a home shows that the switch need not be mechanical-

ly locked to be "overridden" electrically. Of course a car thief would not find it necessary to override the switch if the owner conveniently left the key in the ignition.

5. The path to the ground, before switch 9a changed its contacts, was from 9a to 7, to 9c, to 9d, to ground.

does not contain the element of overriding a locked switch. In the Wells system when the switch is turned to the off position or locked, the set is off and cannot be turned on in any manner or operated at all.[6] For the patient to be able to view television normally without the intervention of an attendant, the switch must be in the unlocked position when the patient takes the steps which make the set operable for normal viewing.

In the Wells system the patient, after first pushing the button in the hand control and viewing the advertisement on channel 8 (the "barker channel," so named because of the circus "barker" advertising his wares) telling how to rent the set, must, in accordance with the instructions there given, hold the button down for 15 seconds (or other predetermined time which Wells considers sufficient as a precaution to prevent accidental renting of the set) and the commercial channels may then be viewed normally.[7]

The mechanism or circuitry by which this result comes about however, is quite different from that in Sonnenberg's system and does not infringe Claim 1 of his patent at all. Basically it makes use of a familiar timing device where an electric charge is built up to a predetermined level, when it makes a semiconductor operate as a conductor, and thus permit current to pass along the path permitting operation of the set.

Both the Sonnenberg and Wells systems make use of a light going on as a signal that the set has been rented. In Sonnenberg the attendant after arranging for rental of the set turns the light off by turning the key, and then turns the key back to the position where the set can be rented again by pushing the two buttons.

In Wells the light remains on for the duration of the whole time that the set is being rented.

The signal light is a useful but not critical feature of both systems. The use of a light to indicate that a system is in a particular state is well known in the prior art, as testified to by Dr. Fred Chernow, and demonstrated by common experience in numerous instances: to show when power is on for an appliance; to show whether the next block of railroad track is clear for an approaching train or occupied; the numerous lights on the dashboard of an automobile, or in the cockpit of an airplane, or in a garage to determine what parts of a car are operating defectively; whether an elevator going up or down is approaching; whether the driver of a car in front is using his brakes or intends to move backward in reverse gear; and many other examples too multitudinous to mention. The use of a light as a signal, even if used by Wells in an identical manner with Sonnenberg rather than differently, would not constitute infringement of a validly patentable feature of the Sonnenberg system in view of the generally practiced prior art.[8]

We discuss this feature of the patent at such length only because the Court of Appeals in *Federal Laboratories v. Barringer Research Ltd.,* 696 F.2d 271, 273 (C.A. 3, 1981), seemed to consider the indicating signal described in Claim 1(d) of patent No. 3,430,221 as a significant aspect of the metal detecting device there involved, although entirely unrelated to the basic technology involved in determining the presence of metallic content by use of eddy current.

---

6. Wells management considered this feature important as a means of preventing improper use of the set by problem patients seeking to avoid payment of rent (Ex. AS, dated January 30, 1980).

7. That ACS uses two pushbuttons and Wells only one (but which must be held down for a certain length of time) is immaterial. See the discussion regarding two or three positions in *Rengo Co. Ltd. v. Molins Machinery Co.,* 657 F.2d 535, 538, 550, 552 (C.A.3, 1981).

8. As stated by Dr. Fred Chernow (PTX 69):

"Claim 3 merely describes the use of an indicating light which is on or off in accordance with the state of the override switching means. The use of such an indicator light to indicate the rental state of the television set was known in both the CompuTel and Western New York Hospital systems prior to the Sonnenberg application, and claim 3 therefore describes nothing which would not have been obvious at that time."

From the foregoing it is clear that no part of Claim 1 of the Sonnenberg patent is infringed by the Wells system. Wells does not override the locked switch at all but uses other well known techniques to actuate a semiconductor by a charge built up sufficiently during a predetermined elapsed time. Moreover, if the public interest in preventing monopolization of what is in the public domain [9] prevents it from being purely *obiter dictum* [10], we hold that the overriding of switches by providing an alternative path for current to actuate an appliance is a commonly practiced technique well known in the art prior to Sonnenberg's patent, and that his Claim 1 is therefore invalid as obvious. The statutory presumption of 35 U.S.C. § 282 is entirely annihilated by the indisputable facts in the record.

Perhaps the manifest and substantial difference between the ACS and Wells systems can best be explained by the description given by the defendant's well-qualified and reliable expert witness, Dr. Fred Chernow, in his report (PTX 69):

> ... it is clear that the Wells television sets do not operate in the manner described in the claims of the Sonnenberg patent. Claim 1 requires that the on position of the key operated switch enables the television to be operated and that the switching of the override switching means to an actuated position enables the television to be operated even when the key operated switch is in its off position. This claim language therefore requires that operation of the television set may be enabled in either position of the key operated switch, but this is not the case in the Wells television sets which can only be operated when the key operated switch is in its on position.
>
> In particular, the Wells sets do not have any feature corresponding to the

claimed "*override* switching means capable of being switched from a normal position to an actuated position *for overriding said key operated switch when in its off position....*" The push button switch of the Wells set initiates rental if, and only if, the keylock is in the on position. Nothing in the keylock is overridden or bypassed by the push-button switch.

Claim 1 further specifies, "said override switching means when switched to its actuated position remains in said position until said key operated switch is switched into its on position." There is nothing comparable to this feature in the Wells sets. This part of the claim describes what happens after the override switch of Sonnenberg puts the TV in the rental state. The override switch, and the light are turned off by switching the keylock switch to the "on" position. The set remains rented but the light goes off.

In the Wells set, even if the push button switch were improperly designated an override switch, it still would not be turned off by turning "on" the keylock. In fact, such an operation represents an impossible sequence for the Wells set. The push button switch is not able to function unless the keylock switch is already on.

Dr. Chernow then convincingly reviewed prior art and patents anticipating Sonnenberg's claims. One example was Sonnenberg's own device known as CompuTel, which was demonstrated, promoted, and offered for sale to the public (and perhaps one unit was actually sold) in 1976 and 1977 before the ACS patent was applied for in 1980. See 35 U.S.C. § 102(b).

The prior art CompuTel system included a patient initiated two-button switch for activating the rental of the TV and further included indicator lights on the

---

**9.** "[I]t is a public service to strike down an invalid patent, which is in truth a trespass upon the public domain." *Borden Co. v. Clearfield Cheese Co.,* 244 F.Supp. 366, 368 (W.D.Pa. 1965); *Automatic Radio Mfg. Co. v. Hazeltine Research Inc.,* 339 U.S. 827, 840, 70 S.Ct. 894, 901, 94 L.Ed. 1312 (1950).

**10.** The non-infringement issue is so clear that it really disposes of the case without consideration of validity.

buttons. The lights illuminated when the two-button switch was activated. In at least one demonstration of the CompuTel system, the TV used had a keylock with on and off positions. The CompuTel had every feature of Claim 1.

Even the earlier CompuTel demonstrations using TVs without keylocks would render the invention of claim 1 obvious. It was well known to provide keylocks on TV sets to perform the function of turning the power on and off. To add such a keylock to the earliest CompuTel sets would have been obvious to anyone of ordinary skill in the art.

Plaintiff's expert, Robert Burroughs, was a well-qualified witness with extensive experience in the industry, (he had manufactured equipment for both ACS and Wells) but his testimony on behalf of plaintiff's patent consisted mainly of conclusory generalities. He construed "override switching means" in Claim 1 as including any "means where the patient can go from the rentable condition to a rented condition without the use of a key" (Tr. 176). This interpretation of the claim is overly broad. As previously stated, overriding a switch means providing an alternative path for electric current so that the television may be operated even while the switch remains locked and inoperative.

Plaintiff argues that any system where a patient pushes a button with the purpose and result of being able to operate a television set normally without the assistance of an attendant using a key constitutes an infringement of the ACS patent. This contention is much too broad and general. Patent protection is accorded only to specific processes or products where the *modus operandi* is clearly delineated with sufficient precision that the teaching of the patent can be practiced by others in the industry. It must be remembered that a patent must *add to* the collective knowledge of the industry; it can not be utilized to withdraw from the scope of the known art methods already familiar and widely practiced. *Graham v. John Deere Co.*, 383 U.S. 1, 6, 86 S.Ct. 684, 688, 15 L.Ed.2d 545 (1966). A broad claim, covering all methods of attaining a desired result or solving a widely-felt problem, is not patentable. A patentee could not claim all methods of curing cancer, for example: one researcher might accomplish the desired result by a wonder drug; another by massage and laser beams. There are many roads to Rome. Plaintiff can not monopolize *all* systems of enabling a hospital patient to view television normally under his own power without the aid of an attendant. ACS can claim under its patent only the process described in detail and taught with precision in patent No. 4,183,057.

■ The doctrine of equivalents merely protects the scope of a valid patent from insignificant variations resorted to as a subterfuge to avoid the patent claims. *Graver Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607–609, 70 S.Ct. 854, 855–857, 94 L.Ed. 1097 (1950). For example, in the ACS patent it would not eliminate the existence of infringement if the infringer put the override switching mechanism inside the television set itself, instead of in the hand-held control. Here the doctrine of equivalents would be applicable to protect the patent monopoly to its *bona fide* legitimate extent against competitors seeking to work around the patent right by making trifling "unimportant and insubstantial changes" in details.

This opinion shall be deemed to embody the court's conclusions of law and findings of fact in accordance with Rule 52(a) FRCP.

The case at bar does not seem sufficiently "exceptional" to justify an award of counsel fees under 35 U.S.C. § 285. It is rather a run-of-mine patent case. Doubtless plaintiff followed the method described by Thurman Arnold of learning about the case after filing it;[11] for plaintiff originally contend-

11. Today the Federal Rules of Civil Procedure "permit a litigant who suspects he has a good case as either plaintiff or defendant to file a complaint or an answer without knowing whether the allegations are true or not, and then use the process of discovery to find out if he is right." Thurman Arnold, *Fair Fights and Foul* (1965) 266.

ed that his earlier device CompuTel was covered by his patent, but later eliminated this aspect of the case by amendment.[12] He also failed to inform the Patent Office about CompuTel. But these tactical peccadilloes do not amount to such outrageous conduct or lack of good faith as to warrant imposition of counsel fees. Defendants are entitled only to normal court costs as prevailing parties.

Judgment is rendered for the defendants.

12. Plaintiff's answer (sworn to on September 3, 1981) to Montefiore's Interrogatory No. 31(a)(3) asking the date of conception of "the alleged invention that is the subject of the patent in suit" gave the date of conception of CompuTel as "At least as early as the early portion of 1976." This passage was deleted by plaintiff's Supplemental Answers filed January 7, 1983.