**PAPERCRAFT CORPORATION, a corporation, Plaintiff,**

v.

**The FEDERAL TRADE COMMISSION, Paul Rand Dixon, Chairman, Philip Elman, A. Everett MacIntyre, Mary Gardiner Jones, and James M. Nicholson, Commissioners, Defendants.**

Civ. A. No. 69–1136.

United States District Court
W. D. Pennsylvania.

Jan. 14, 1970.

**1402**

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa.

David J. McKean, McKean & Whitehead and Cohn & Marks, Washington, D. C., for plaintiff.

W. Wendell Stanton, Asst. U. S. Atty., Pittsburgh, Pa.

Harold D. Rhynedance, Jr., Federal Trade Commission, Washington, D. C., for defendants.

## OPINION

DUMBAULD, District Judge.

Plaintiff here, Papercraft Corporation (hereinafter sometimes called Papercraft) manufactures gift wrapping paper, and is respondent in a proceeding before the Federal Trade Commission (sometimes hereinafter called FTC), defendant here, charging Papercraft with violation of Section 7 of the Clayton Act (15 U.S.C. § 18), which reads as follows:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

Plaintiff asks this Court to interrupt by injunction the course of the administrative proceeding and to require the Commission, before continuing with the scheduled hearing of the charges of Section 7 violation against plaintiff, to exercise the power which Section 6(b) of the Federal Trade Commission Act (15 U.S.C. § 46(b)) vests in the Commission by conducting a study by virtue of that Section concerning the market in gift wrappings and obtaining from the companies engaged in that business certain data concerning the volume of their business.

Section 6(b) reads as follows:

To require, by general or special orders, corporations engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission.

On its face this provision appears to provide a discretionary measure which the FTC, in the exercise of its investigatory powers, may employ when, as, and if it sees fit, in order to develop data concerning an industry which might prove helpful to the Commission in its task of preventing monopolistic practices.

This power is thus akin to that conferred upon the Interstate Commerce Commission enabling it to elicit valuation reports from pipe lines, Champlin Refining Co. v. United States, 329 U.S. 29, 34–35, 67 S.Ct. 1, 91 L.Ed. 22 (1946), or that conferred upon the Civil Rights Commission enabling it to investigate and publicize unfair electoral practices, without actually adjudicating specific cases. Hannah v. Larche, 363 U.S. 420, 440–441, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

Plaintiff argues, however, that the 6(b) power can be and has been used by the Commission as a "tool of litigation" to unearth evidence for use in particular proceedings, as well as a means of generating information useful in connection with the Commission's general regulatory functions.[1]

As such a tool, plaintiff argues, it should be made available to Papercraft on equal terms with its governmental adversary; and failure to afford such equal access to this engine of litigation constitutes denial of due process and equal protection. Plaintiff also contends that Section 6 of the Administrative Procedure Act (5 U.S.C. § 555(d))[2] re-

1. Such use of the power was specifically upheld in United States v. St. Regis Paper Co., 285 F.2d 607, 611–613 (S.D.N.Y.1960).

2. That provision reads:
Agency subpenas authorized by law shall be issued to a party on request and, when required by rules of procedure, on a statement or showing of

quires the FTC to afford Papercraft this remedy as a sort of species of subpoena power.

█ But it seems clear that the section of the Administrative Procedure Act relied upon by plaintiff refers only to the ordinary subpoena power which Section 9 of the Federal Trade Commission Act (15 U.S.C. § 49) creates for proceedings before that agency.

There is nothing to prevent Papercraft from making full use of this specifically provided subpoena power as an appropriate and effective "tool of litigation" in preparation and presentation of its case in the Section 7 proceeding.

█ Moreover, the sting is taken from any constitutional claims of unfairness or inequality on the part of the adversaries in the monopoly litigation by the assurance in open court by trial counsel for the Commission that it will not utilize the 6(b) power in connection with the pending Section 7 proceeding against Papercraft.

Under these circumstances it is clear that a Court should not thrust its sickle into the administrative proceeding or impede the due course thereof. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 51–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Borden Co. v. Clearfield Cheese Co., 244 F.Supp. 366, 367 (W.D. Pa.1965). Also the doctrine of primary jurisdiction compels the same conclusion.

Such judicial review as is provided in FTC proceedings is to be handled by the Courts of Appeals. 15 U.S.C. § 45(c) and (d).

It may be conceded *arguendo* that perhaps this Court would have jurisdiction to afford redress in a clear case of *ultra vires* or of plain failure to perform a mandatory statutory duty. Cf. Oestereich v. Selective Service Board, 393 U.S. 233, 235, 239, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). We believe that this is exactly what was held in Union Bag-Camp Paper Corp. v. F. T. C., 233 F.Supp. 660, 663 (S.D.N.Y.1964). Judge Cooper there held also that Section 6(b) did not create any such statutory duty. *Ibid.*, 664–666. We share Judge Cooper's view on both points, as well as on the constitutional issue, and consider the *Union Bag* decision as squarely dispositive of the case at bar.

It should be noted that in the pending proceeding the FTC is exercising its normal and classical function of protecting the maintenance of a competitive economy in interstate commerce. The proceeding is not one of the type against which recent critics of the Commission have directed their animadversions. The FTC is here not dealing with minute misrepresentations arising in connection with the labeling of furs or fabrics, or counterproductive fiddling around with putative violations of the Robinson-Patman Act.

The Commission has been the target of considerable recent criticism, first by "Nader's Raiders",[3] and then by a committee of the American Bar Association appointed pursuant to a request made on April 18, 1969, by President Richard Milhous Nixon.[4] The committee's report, dated September 15, 1969, criticized the Commission for devoting too much effort to unimportant matters (such as mislabeling of fur products and fabrics) which resulted in no substantial benefits to the consuming public.

---

general relevance and reasonable scope of the evidence sought. On contest, the court shall sustain the subpena or similar process or demand to the extent that it is found to be in accordance with law. In a proceeding for enforcement, the court shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply.

3. See Edward F. Cox, Robert C. Fellmeth, and John E. Schulz, "The Nader Report" on the Federal Trade Commission, New York: Richard W. Baron Publishing Co., 1969.

4. The Chairman of the committee was Miles W. Kirkpatrick, Esq., of Philadelphia, son of a distinguished federal judge, and chairman of the Antitrust Law Section of the American Bar Association.

These criticisms were most trenchantly formulated in the separate concurring statement of Professor Richard A. Posner, a member of the committee. Professor Posner regards much of the Commission's Robinson-Patman Act enforcement as "inexplicable in terms of the goal of promoting a competitive economy".[5] Nothing in that Act, he contends, "compels the Commission to enforce it so much, and with such literal-mindedness. The wise exercise of administrative discretion should lead the Commission to remit most Robinson-Patman complainants to the private remedies that the Act provides, and, in those cases that it does bring, to interpret the rather plastic language of the Act in a manner designed to make it harmonious with rather than subversive of antitrust policy".[6]

Likewise in the field of mislabeling and deceptive practices Professor Posner argues that use of FTC proceedings saddles the public with costs more appropriately to be borne by rival tradesmen.

> Ordinarily, a firm cannot conduct a lawsuit against a competitor or potential competitor without incurring costs comparable to those of its opponent. This rough equality of burdens is a deterrent to the use of the litigation process to harass. Proceeding against a competitor by way of a complaint to the Trade Commission, in contrast, is a method of imposing the cost of litigation on the competitor at no cost to the complainant. All of the costs of prosecution are borne by the FTC; all of the costs of defense by the respondent. The complainant pays nothing. This arrangement creates an incentive to engage in litigation designed purely to suppress competition, for it enables the complaining party to create a barrier to entry in its exact technical sense: a condition that imposes upon a new entrant a cost not borne by firms already in the market.

I emphasize the effects of the unequal burdens of FTC litigation on entry because it is the new firm or, what is analytically quite similar, the new product sold by an existing firm that is most vulnerable to a charge of deceptive marketing. A new product is generally a substitute for an old one, and to market the new product successfully the seller must convince consumers that it has all or many of the best features of the old, besides being cheaper or otherwise preferable. This gives an opening to the seller of the old product to argue that its attributes are being falsely ascribed to the new. Such arguments are likely to fare better before an administrative agency that conceives its mission as one of protecting fools from being misled than before a court that views its mission as the impartial resolution of disputes between an old and a new seller.

A perusal of FTC rules and decisions reveals hundreds of cases in which prohibitory orders have been entered against practices, not involving serious deception, by which sellers have attempted to market a new, often cheaper, substitute for an existing product. Forced disclosure of the country of origin of watchbands, Christmas tree bulbs, radio components and scores of other products; prohibition of literally true designations on the ground that they might cause confusion with the same product made by a different process (e. g., charcoal made out of corn cobs); broad prohibitions against comparisons with more expensive substitutes; forced disclosure of facts that are irrelevant to product performance but might alarm consumers (for example, that motor oil has been "reprocessed"): these and other unworthy categories of proceeding constitute a significant part of the FTC's total output over the years.[7]

---

5. Report of the ABA Commission to Study the Federal Trade Commission, p. 100.

6. *Ibid.,* 101.

7. *Ibid.,* 108–109.

In particular, the Commission is blamed for excessive emphasis upon cases involving deceptive labeling of fur, wool, and textile products:

> The purpose of the specialized statutes, as disclosed by their terms and the legislative history, is less to combat fraud than to protect the trademarks and goodwill of high-grade furs, wools, and textile fibers against infringement or dilution by sellers of cheap substitutes. Judging from the cases in my sample, much of the Commission's enforcement activity under these statutes consists of springing traps on the unwary: sellers are enjoined for failing to label natural mink "natural"; for using abbreviations instead of the full name; and for other misdeeds of comparable gravity. My point, however, is not that the Commission's enforcement of these curious laws (which it helped get enacted) is frequently aberrational but that the policing of trademarks and quality standards is a job for sellers and their trade associations rather than for the government.[8]

In conclusion, Professor Posner declares that:

> In fiscal year 1963, one is forced to conclude, the FTC bought precious little consumer protection for the more than $5 million that it expended in the area of fraudulent and unfair marketing practices, and the many millions more that it forced the private sector to expend in litigation and compliance. Besides wasting a good deal of money in tilting at windmills, the Commission inflicted additional social costs of unknown magnitude by impeding the free marketing of cheap substitute products, including foreign products of all kinds, fiber substitutes for animal furs, costume jewelry, and inexpensive scents; and by obstructing a fair market test for products of debatable efficacy.
>
> \*     \*     \*     \*     \*     \*
>
> Given the absence of any mechanism for effectively conforming the private

interests of FTC personnel to the social interest in consumer protection, it is hardly surprising that over the years the FTC has devoted its principal efforts to bringing cases that, if our sample is at all representative, do not promote any coherent public policy, at the behest of corporations, trade associations, and trade unions whose motivation is at best to shift the costs of their private litigation to the taxpayer and at worst to harass competitors. By taking the part of well organized economic pressure groups, representing established firms and their employees, rather than of new entrants, foreigners, and the unorganized, largely silent consumer, the FTC commissioners and staff have minimized the friction and work that a genuine dedication to consumer interests would have entailed. By concentrating on trivial fraud cases, the Commission and its staff have created the illusion of tangible results, while minimizing controversy. And by concentrating its antitrust activities not in monopolistic or oligopolistic industries, but in the most competitive industries in the American economy, such as food, textile, and retail and wholesale distribution, and by applying antitrust principles to shield powerful organized economic blocs in those industries (such as food brokers and retail gasoline dealers) from the competitive gale, the Commission has curried favor with the groups whose power to affect the fortunes of Commission personnel is greatest.[9]

But, as previously stated, the pending administrative proceeding involved in the case at bar is not one of the trivial or counterproductive type upon which FTC critics have focussed their fire, but is an orthodox attack upon anticompetitive, monopolistic practices.

Plaintiff emphasizes that in an incipient monopolization case under Section 7 (just as in a monopolizing case under Section 2 of the Sherman Act, 15 U.S.C. § 2) it is important to ascertain

---

8. *Ibid.*, 111–12.

9. *Ibid.*, 113, 117–18.

the size and dimensions of the market. Sales of a given absolute volume constitute a relatively higher (and hence more vulnerable) percentage of a small market than they would of a larger market. In order for market shares or percentages to be meaningful or significant with respect to their effect on competition, it is needful to determine just what the market in question includes.

Thus, in the leading case involving cellophane, United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 393–396, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) [10], the Supreme Court held that the significant market or line of commerce included not only cellophane, but also other competitive packaging materials. In United States v. Aluminum Co. of America, 377 U.S. 271, 275–277, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), a Section 7 case, it was held that aluminum cable was a separate and distinct market, even if competition from copper cable was experienced to a certain extent. Similarly, decorative aluminum foil suitable for use by florists has been recognized as a separate market. Reynolds Metal Co. v. F. T. C., 114 U.S.App.D.C. 2, 309 F.2d 223, 226–227 (1962).

Plaintiff contends that the gift wrapping market in which it competes is much larger and more extensive than the FTC asserts. Papercraft claims to be in competition with numerous companies in a huge and growing industry, doing a vast volume of business, so that Papercraft's own share of the business done in gift wrappings is of negligible proportions from a competitive standpoint.

Papercraft contends, moreover, that no reliable statistics exist by means of which either plaintiff or the Commission can persuasively prove what the actual market in gift wrappings is. Hence, it urges, the FTC should be compelled by this Court to use the 6(b) power in order to develop adequate data with respect to this issue.

It seems a sufficient answer to this argument to point out that the FTC has the burden of proof with respect to the existence *vel non* of a violation of Section 7. If the Commission fails to submit adequate proof, it will simply fail to prove its case and hence lose it (as many litigants having the *onus probandi* have learned to their sorrow). But the Commission remains *dominus litis* with respect to the manner in which it hopes to establish its case, and has complete discretion with respect to the witnesses and documents it wishes to offer. If the evidence is insufficient, the litigant with the burden of proof must suffer the consequences. It is not for the adversary party, or for this Court, to decide what steps the FTC must take in order to prove its own case. *A fortiori,* Papercraft has no right, nor does this Court, to insist that particular steps be taken in order to help Papercraft prove *its* case. Both parties are free to handle their respective aspects of the litigation in their own way.

No conclusion contrary to that which we have reached is required by any of the cases cited by plaintiff in support of its contention that the FTC is under a statutory or constitutional duty to call for an industry study of the gift wrapping industry in pursuance of the investigatory power conferred by 6(b).

Accordingly, plaintiff's motion for summary judgment is denied and defendant's granted.

---

10. See also Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453, 460–461 (W.D.Pa. 1968).