**PAPERCRAFT CORPORATION**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 71–1681.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1972.

Decided Jan. 25, 1973.

Abe Fortas, Richard M. Schmidt, Jr., David J. McKean, Washington, D. C., and Irwin I. Zatz, Chicago, Ill., for petitioner.

Ronald M. Dietrich, Gen. Counsel, Karl H. Buschmann, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before KILEY and STEVENS, Circuit Judges, and KILKENNY, Senior Circuit Judge.[*]

STEVENS, Circuit Judge.

Papercraft Corporation petitions for review of a Federal Trade Commission order directing divestiture of assets acquired from CPS Industries, Inc., pursuant to an exchange of shares in December, 1967. The petition does not challenge the conclusion that the acquisition violated § 7 of the Clayton Act.[1] Papercraft contends: (1) that the Hearing Examiner's refusal to subpoena sales data from 551 companies allegedly engaged in the relevant line of commerce deprived it of a fair hearing, and (2) that the Commission abused its authority by restraining Papercraft from selling to customers of CPS for a three-year period.

## I.

Prior to the acquisition, Papercraft and CPS were leading firms in the gift wrap industry. The term "gift wrap," though somewhat vague, encompasses wrapping paper and foil, ribbons, and various related items such as gift boxes and bows. CPS, an older firm, sold primarily high quality specialized merchandise; Papercraft, a younger and more aggressive company, concentrated on promotion of less expensive lines. Before the Commission, Papercraft argued (a) that CPS was a failing company, cf. International Shoe Co. v. F.T.C., 280 U.S. 291, 299–303, 50 S.Ct. 89, 74 L.Ed. 431; (b) that since CPS and Papercraft sold largely in different submarkets, they were not in substantial competition with each other, cf. International Shoe, supra at 295–299, 50 S.Ct. 89; and (c) that if Papercraft's request for 551 subpoenas had been granted, it might have proved that the relevant market was as much as twice as large as indicated by the evidence presented by complaint counsel. Only the third argument is pressed on appeal; there is no claim that the information sought by the requested subpoenas was relevant to the other two defenses.

Papercraft made two requests, the first listing 230 companies believed to be sellers of gift wrap paper and ribbons; each requested subpoena called for documents showing the company's total shipments of gift wrapping paper and ribbon during the year 1967. The second request was for 321 subpoenas *duces tecum* seeking comparable data from companies believed to be in the gift box business.

The two requests were opposed for a variety of reasons, some of which were plainly insufficient. Thus, for example, complaint counsel contended that the requests were untimely,[2] and the Hearing

---

[*] Senior Circuit Judge John F. Kilkenny of the Ninth Circuit sitting by designation.

[1] 38 Stat. 731, as amended in 1950 by 64 Stat. 1125; 15 U.S.C. § 18.

[2] Papercraft had initially moved the Commission to invoke the investigatory authority conferred by § 6(b) of the Federal Trade Commission Act, 15 U.S.C. § 46(b). The Hearing Examiner certified the motion to the full Commission, recommending denial on the ground that Papercraft had failed to demonstrate that equally probative evidence could not be obtained without a § 6(b) survey. The Commission accepted the Examiner's recommendation. Thereafter Papercraft sought an injunction in the district court to compel the Commission to obtain § 6(b) reports before the administrative hearings commenced. See Papercraft

Examiner rejected the subpoena request directed to gift box companies on the ground that gift boxes were not part of the relevant product market.[3]

Papercraft did not seek an interlocutory appeal to the full Commission from the Examiner's order denying the application for subpoenas. The issue was therefore first presented to the full Commission as one of the contentions urged on appeal from the Examiner's initial decision after the evidentiary record had been completed. In its opinion the Commission set forth reasons, which we consider adequate, for refusing to disturb the Hearing Examiner's rejection of the subpoena requests.

■ The Commission first held that subpoenas *duces tecum* should not be issued to 550 companies if other reasonable means of developing necessary industry data are available.[4] We agree with this holding because the service of so many subpoenas, and the processing of the responses, would inevitably tend to delay the proceedings and might unnecessarily require the disclosure of confidential data. *Cf.* F.T.C. v. American Tobacco Co., 264 U.S. 298, 305–306, 44 S.Ct. 336, 68 L.Ed. 696.

The Commission opinion identified various sources of industry data which the Commission found to be reasonably reliable.[5] Since it does not appear that Papercraft made any serious attempt to develop additional evidence from such sources, or to demonstrate that they were substantially inaccurate,[6] it did not satisfy the Commission's requirement for the issuance of such a large group of subpoenas.

■ Papercraft argues, however, that the Commission's analysis, though it might justify denial of a wholesale request for 551 subpoenas, does not justify the denial of a more limited number which might have demonstrated error in aspects of the prima facie case. This argument is valid. Papercraft, however, cannot properly complain of denial of a request that it never made. Its failure to pray in the alternative for a lesser number of subpoenas in the event— which certainly was not unforeseeable— that the Examiner might consider the wholesale request excessive, forecloses its contention here that something less should have been ordered by the

---

Corp. v. Federal Trade Commission, 307 F.Supp. 1401 (W.D.Pa.1970). The denial of that relief was followed by a request during the presentation of complaint counsel's case in chief for the issuance of Commission subpoenas; the Hearing Examiner deferred ruling on that request until the close of complaint counsel's case. In the circumstances, even though we recognize that subpoenas could have been requested at an earlier date, we cannot accept the argument that Papercraft's request was not timely. On the other hand, we find no merit in Papercraft's argument that the Commission's opposition to the § 6(b) motion partially on the ground that subpoenas provided one alternative means of obtaining appropriate information should foreclose their opposition to the particular request for 551 subpoenas which was ultimately denied.

3. Contrary to the opinion of the Hearing Examiner, the Commission concluded that gift boxes were within the relevant product market. It also found, however, that they

were relatively insignificant in quantity and that their exclusion did not affect the Examiner's overall assessment of the competitive impact of the merger.

4. "The issuance of orders requiring special written reports, or of *subpoenas duces tecum*, to 550 companies should obviously be undertaken only if there is no other reasonable way to develop the necessary industry data." A. 369.

5. These sources included census figures, known sales volumes for leading companies, trade association information, and estimates by experienced executives. The Commission found that the conclusion to be derived from these sources defined a total gift wrap market "in the general range of $150 million," and found nothing in the record to impeach that overall assessment.

6. Indeed, Papercraft did not even call its own chief executive whose market estimate of $177,000,000 had been quoted in a trade publication.

Examiner.[7] *Cf.* F.T.C. v. American Tobacco Co., 264 U.S. 298, 307, 44 S.Ct. 336, 68 L.Ed. 696.

█ Much of the argument before us related to the reliability of complaint counsel's evidence defining the size of the relevant market and the respective shares represented by Papercraft and CPS prior to the acquisition. Our holding is not predicated on the theory, which seems to underlie much of the Commission's argument, that its prima facie evidence was so convincing that it is inconceivable that any material contradiction could have been developed in respondent's case. On the contrary, we merely hold that the Commission may properly require a showing of need, which Papercraft failed to make in this case, before it will issue 551 subpoenas

*duces tecum* for the purpose of establishing the precise contours of the relevant market in a § 7 case.[8] Papercraft failed to make an adequate demonstration of the need for its exceptional request.

## II.

In his discussion of the remedy, the Hearing Examiner concluded: "Effective competition can be restored only by reestablishing CPS as a full-line company in the production and sale of gift wrap products, as it was prior to its acquisition.[9] He rejected Papercraft's proposal that divestiture be limited to the CPS product lines which were directly competitive with Papercraft products. His recommended order directed complete divestiture within six months, re-

7. "The Commission, in the issuance of a subpoena duces tecum, . . . is authorized to deny the application in its entirety if it is 'too sweeping in its terms to be regarded as reasonable.' Hale v. Henkel, 201 U.S. 43, 76, 77, 26 S.Ct. 370, 380, 50 L.Ed. 652, . . .; Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 306, 44 S.Ct. 336, 68 L.Ed. 696. . . . Under such circumstances a demand for the whole is not warranted, even though some part of the papers asked for may be relevant." E. B. Muller & Co. v. F.T.C., 142 F.2d 511, 520 (6th Cir. 1944). While *Muller* dealt with the issuance of a single subpoena, and the subpoenaed party agreed to make a lesser production, we think the logic is applicable by analogy. The F.T.C. may deny the request in its entirety if the request is too broad in numbers to be regarded as reasonable.

8. Other than by seeking to use the compulsory process of the Commission, Papercraft made no attempt to prove its allegation that the relevant market was $300,000,000 and presented nothing to contradict complaint counsel's extensive evidence tending to prove that the market was approximately $150,000,000. Papercraft did not offer affirmative evidence in an effort to show that a more reliable and detailed survey of the relevant market was necessary; consequently, no showing of prejudice has been made. See N.L.R.B. v. Seine and Line Fisherman's Union, 374 F.2d 974, 981–982 (9th Cir. 1967).

The underlying considerations here are similar to those identified by Judge Learned Hand in N.L.R.B. v. Blackstone Mfg. Co., 123 F.2d 633, 635 (2d Cir. 1941):

"In the case at bar the respondent's only statement of 'the nature of the facts to be proved' was that it wished 'to cross-examine them' (the signers of the cards) 'as to the authenticity of their signatures and as to the present status of any of the alleged authorizations contained on the cards'. This demand the Board might indeed have been obliged to grant, if the respondent had examined the cards and compared them with signatures in its possession, or if it had proved that it had no means of comparison. But it refused even to look at the cards, alleging that it might later be charged with discrimination, a position clearly inconsistent with a desire to cross-examine the signers. The employees were presumably within its reach without subpoena anyway, and the request had every mark of being what the Board declared that it was. While we should indeed be jealous of any denial of process to an employer, the Board is not powerless to prevent itself from being put upon by frivolous and dilatory demands."

A persuasive showing of need as a prerequisite to the wholesale issuance of subpoenas does not offend due process or the Administrative Procedure Act.

9. A. 325.

quired prior approval by the Commission of the plan or agreement of divestiture, and prohibited future acquisitions by Papercraft without the Commission's approval for a ten-year period. Papercraft does not object to these aspects of the order. However, the remedial order also provided in paragraph IX that Papercraft could not sell any decorative gift wrap products to certain customers or former customers of CPS for a period of three years from the date of divestiture. It is that paragraph, as modified by the Commission, which Papercraft challenges here.

As recommended by the Hearing Examiner, paragraph IX would have prohibited Papercraft from selling to any former customer of CPS unless Papercraft had made sales to that account prior to December 27, 1967, the acquisition date.[10] The Commission initially adopted paragraph IX in this form without any comment on the need or justification for such a provision.

Papercraft then filed a petition for reconsideration or reopening, contending that paragraph IX was unprecedented, unsupported by findings or evidence, and would restrain rather than restore competition. The petition pointed out that the CPS business had been operated separately since the acquisition and that the CPS product lines and marketing practices had been preserved. The record indicates that CPS sales and profits had increased materially under Papercraft ownership.

The Commission modified paragraph IX by limiting the prohibition to accounts "which at any time during the two (2) years preceding December 27, 1967, and until divestiture is effected hereunder" had been sold any gift wrap by CPS.[11] The order contained no other comment on paragraph IX.

██ Paragraph IX is by no means a standard remedial provision. Other divestiture orders have included special provisions designed to insure the survival of the divested business, but in each such instance the supporting findings demonstrated the need for a special protective provision.[12] Such find-

---

10. In its recommended form, paragraph IX provided:

"IT IS FURTHER ORDERED that for a period of three (3) years from the date of divestiture The Papercraft Corporation is prohibited from selling any decorative gift wrap products to any customer account which at any time has been sold any decorative gift wrap products by CPS Industries, Inc., unless such customer account was sold such decorative gift wrap products by The Papercraft Corporation prior to December 27, 1967." A. 328-329.

11. The order entered on September 9, 1971, provided, in part:

"IT IS FURTHER ORDERED that Paragraph IX of the Commission's final order of June 30, 1971, be, and it hereby is, modified to read as follows:

"IT IS FURTHER ORDERED that for a period of three (3) years from the date of divestiture the Papercraft Corporation is prohibited from selling any decorative giftwrap products to any direct customer account of CPS Industries, Inc., which at any time during the two (2) years preceding December 27, 1967, and until divestiture is effected

hereunder, has been sold any decorative giftwrap products by CPS Industries, Inc., unless such customer account was sold such decorative giftwrap products by the Papercraft Corporation prior to December 27, 1967.

"IT IS FURTHER ORDERED that respondent's Petition for Reconsideration be, and it hereby is, otherwise denied; . . . ." A. 400.

12. In Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492, even though Autolite's precarious post-divestment position was not attributable to Ford's acquisition, the findings clearly supported the conclusion that it might not survive unless Ford was prohibited from making an independent entry into the market and required, in effect, to subsidize it for a limited period of time. (See 405 U.S. at 582-583, 92 S.Ct. 1142, opinion of Chief Justice Burger.) The position of Ford in the sparkplug market is wholly dissimilar to the position of Papercraft in the gift wrap business, and there are no findings in this record indicating that CPS's post-divestment position will be precarious or that paragraph IX would forestall any significant threat to survival.

ings are essential for two important reasons: courts cannot properly perform their reviewing function unless the basis for administrative action is adequately explained. S.E.C. v. Chenery Corp., 318 U.S. 80, 84, 63 S.Ct. 454, 87 L.Ed. 626; F.T.C. v. Crowther, 139 U.S.App.DC. 137, 430 F.2d 510, 514 (1970); and since the purpose of the statute is to preserve competition, novel provisions which create artificial market barriers should not be accepted as routine without careful analysis.

Unquestionably, a wholesome purpose may be served by a limited restraint on competition in certain situations.[13] Conceivably, no buyer would purchase the CPS business without the protection afforded by the former owner's covenant not to compete for certain accounts, in certain areas, or in certain product lines for a limited period of time.[14] However, neither Commission counsel nor the findings suggest any such justification for paragraph IX. Instead, taking a position somewhat inconsistent with the Commission's rejection of the defense that CPS was a "failing company" at the time of acquisition, Commission counsel argue that paragraph IX was included "so that CPS can reestablish itself as a viable competitor in the marketplace." [15]

The findings indicate, however, that CPS is fully capable of survival as a "viable competitor" without paragraph IX; certainly they do not remotely suggest that the company's ability to survive is dependent on such a provision.

The findings describe CPS as the largest as well as the oldest significant firm in the industry. They do indicate that CPS suffered losses in 1964 and 1965 as a result of non-recurring costs associated with the relocation of its major plant, and in 1967 as the result of the post-acquisition accounting determination that the value of its inventory should be "written down." The findings also recognize that CPS had a management problem during the mid and late 1960s. They conclude, however, that with proper executive leadership, pretax earnings of $1,900,000 on sales of $19,000,000 could be anticipated.

The Papercraft executives provided CPS with effective management, and, accordingly, CPS has prospered since the acquisition. Upon divestiture, presumably, the key executives would remain with Papercraft, and the new owner of CPS would face the problem of providing effective new leadership for the company. Nothing in the findings or the evidence suggests that competent executive talent is unavailable, or that potential new executives' willingness to join CPS is somehow dependent on the existence of a limited protection against competition from Papercraft. Paragraph IX cannot be rationalized as a solution for the CPS management problem.[16]

If the management problem is put to one side, there is nothing in the findings to suggest that CPS will be less able to maintain its position as market leader than if the acquisition had never taken

---

In L. G. Balfour Co. v. F.T.C., 442 F.2d 21 (7th Cir. 1971), exceptional relief was supported by findings describing an unusual history of predatory behavior in a market which had been dominated by one firm for many years. The order was designed to resurrect competition in a monopolistic market, see 442 F.2d at 23, not, as in this case, to preserve the position of the largest firm in a market containing at least a score of significant competitors.

13. See, c. g., Mitchel v. Reynolds, 24 Eng. Rep. 347 (K.B. 1711).

14. Presumably the precise form of a permissible covenant not to compete, along with other elements of the bargain, would be subject to negotiation between Papercraft and any prospective purchaser of the divested asset. The form of such a covenant would, of course, be subject to Commission approval under paragraph IX of the order.

15. Brief for respondent, p. 41.

16. If the company is indeed doomed because its management is inadequate, paragraph IX certainly will not enable it to survive.

place. Indeed, the evidence implies that CPS will be a stronger company following divestiture than it was in 1967. As in the past, it will face competition from about 20 significant producers and many more small concerns, but the Commission has failed to demonstrate that its survival may depend on the imposition of special restraints against just one of those rivals.

The restriction imposed on Papercraft by paragraph IX is not "narrowly drawn," as appellate counsel for the Commission contend. As already noted, Papercraft is a relatively young company, many of whose lines are not competitive with any products sold by CPS. Under paragraph IX, Papercraft could not even sell noncompetitive items to a new customer who had made a single purchase from CPS at some time after December 9, 1965. The restriction would apply even if CPS had received no business from the account since 1966. Moreover, even if such an account had been obtained by Papercraft in 1968 and regularly supplied thereafter with items not handled by CPS, the customer would be required to go elsewhere for such merchandise. In such a case, the restraint would harm the customer and Papercraft, be of no benefit to CPS, and provide a gratuitous competitive advantage to other companies seeking that business.

Perhaps the posited case is purely theoretical, or so improbable as to be insignificant in a fair overall assessment of the impact of the order on the competitive market. Our problem is that we simply cannot tell from the findings, or the portions of the record discussed in the argument, whether the adverse impact on competition which paragraph IX will certainly produce is outweighed by the risk that the market leader will suddenly collapse without this interim protection.

We are conscious of the deference to be accorded to the expertise of the administrative agency, particularly in the fashioning of appropriate remedies.[17] But when it selects an untried and blunt instrument which will certainly cause some impairment of statutory objectives, we require a more careful exposition of its justification before we will sanction it as a proper remedial tool. The Commission failed to make an adequate demonstration of the need for its exceptional remedy.

The order will be modified by the deletion of paragraph IX. As so modified, it is

Affirmed.

17. F.T.C. v. Mandel Bros., Inc., 359 U.S. 385, 392–393, 79 S.Ct. 818, 3 L.Ed.2d 893; F.T.C. v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 1 L.Ed.2d 438; F.T.C. v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081.